IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 28, 2018 Session

**STATE OF TENNESSEE v. JAIME F. ZARATE**

**Appeal from the Criminal Court for Hamilton County
No. 286916   Barry A. Steelman, Judge**

_____

**No. E2017-02553-CCA-R3-CD**

_____

Defendant, Jaime F. Zarate, was convicted of rape of a child by a Hamilton County jury. The trial court imposed a sentence of thirty years at one-hundred percent to be served in the Department of Correction. On appeal, Defendant argues that the evidence was insufficient to support his conviction, that the prosecutor improperly misstated evidence during closing arguments, that the trial court erred by admitting the victim's statement to her mother and by admitting the 911 call, and that the trial court improperly sentenced him. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

D. Marty Lasley, Chattanooga, Tennessee, for the appellant, Jaime F. Zarate.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Leslie Longshore and Kevin Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

*Background*

Initially, we note that in order to protect the minor victim, she will be referred to solely throughout this opinion as "the victim." Because the victim was a minor at the time of the offenses, we will refer to the victim's mother and other members of the victim's immediate family by their initials in order to further protect the victim's identity. The victim's mother, C.E., testified that Defendant was a friend and that she had rented a

room from Defendant while her husband was in an immigration detention center. She and her husband moved into another residence after he was released; however, C.E. and her husband remained on friendly terms with Defendant. On October 10, 2012, C.E. called Defendant to see if the victim, who was six years old, could go to see a movie with him. She testified:

> That day I called him or he called me - - no, I called him because [the victim] wanted to go to the movies, and at that time my husband had just gotten out of jail and we only had one car, so I couldn't get out to take her places because he worked.
> I really trusted [Defendant]. We all went out together to skate, to go get ice cream. So my daughter said, "I want to go to the movies."
> *    *    *
> I said to him, I called him, I said, "Are you going to go out to the movies with the other people that you always go out with?"
> And he says, he said yes, and I said, "[The victim] wants to go. Can you take her with you?"
> And he said, "Yes, I'll pick her up" at a certain time, I don't remember exactly. He picked her up, they went to the movies.
> I began to get uncomfortable when it was getting later and they hadn't come back yet.

She thought that Defendant picked the victim up at approximately 9:00 p.m. to see the movie. C.E. testified that she later called Defendant to see where he and the victim were, and Defendant said, "Yeah, we're coming."

C.E. testified that she hugged and kissed the victim when she arrived home, and she noticed that the victim smelled like saliva. She then asked the victim if someone had kissed her on the mouth or the cheek. C.E. noticed that the victim became nervous, and the victim told her that Defendant had kissed her. When C.E. asked if anything else happened, the victim began to cry and said that Defendant kissed her mouth, her neck, and her vagina. C.E. immediately called 911. She testified: "Well, I was in shock. The first thing that came to mind was to call the police at 911." C.E. further said: "I thought the worse. I thought that he had abused her, raped her; and while I was on the phone, I took her pants off to make sure nothing was wrong." A police officer later arrived at the house, and C.E. told him everything. Afterwards, C.E. took the victim to the T.C. Thompson Children's hospital at Erlanger. A rape kit examination was performed on the victim, and C.E. spoke with police, Sergeant Tracy May, and the doctor. The following day, October 11, 2012, she took the victim to "the advocacy center."

Dr. Tamara Davis is employed by the T.C. Thompson Children's Hospital as a pediatric emergency room physician. She spoke with C.E. who told her that the victim disclosed to her "a family friend had kissed her mouth and face and licked and touched

her vaginal area and buttocks without penetration." Dr. Davis performed a "head-to-toe" examination of the victim and collected a rape kit. She used a black light for a portion of the exam and then swabbed those areas for DNA evidence. Dr. Davis noted that areas around the victim's mouth and outer vaginal lips/buttocks "fluoresced" from the black light. Dr. Davis testified:

> It just kind of ties in with the fact that this patient disclosed to mom that someone could have potentially done something to put some sort of bodily fluids there, because the patient disclosed to mom specifically that the family friend kissed her mouth and face and licked and touched her vaginal area and buttocks. So with those areas immunoflourescing or lighting up with the black light, they could potentially be sites for bodily fluid that we could swab to get DNA evidence.

The victim, now ten years old, testified that she knew Defendant because her family previously lived with him. She recalled going to see a movie, Hotel Transylvania, with Defendant on one occasion. The victim said that Defendant had asked her if she wanted to go to the movie. Before the movie, Defendant took her to Walmart and bought her a coloring book. After the movie, Defendant took her to his house, and then to his bedroom. The victim noted that "Tito," another resident, was in his own room when she and Defendant arrived at the house. The victim testified that Defendant sat her on his bed, pulled her pants and underwear down and began licking "[i]n her private" and on her neck, and he kissed her on the mouth. The victim testified that she told Defendant to stop but he did not stop. Defendant later took her home, and she told her mother what happened. Her mother called police, and the victim was taken to the doctor.

Investigator William Salyers of the Chattanooga Police Department was assigned to the crime scene unit in October 2012. On October 15, 2012, he collected a buccal swab from Defendant to test for DNA. He also photographed Defendant's Cadillac Escalade and swabbed the steering wheel for DNA.

Sergeant Tracy May of the Chattanooga Police Department testified that she worked with the family investigations unit in October 2012. She received a call shortly before midnight on October 10, 2012, from a patrol officer who had taken a report concerning the victim. Sergeant May told the officer to have C.E. and the victim go to the Children's Hospital at Erlanger, and Sergeant May met them there. Sergeant May spoke with hospital staff and C.E., and she asked hospital staff to perform a rape kit examination on the victim. Sergeant May explained that she did not speak with the victim due to her age and noted that "we have forensic interviewers that usually we take them to do that part, because I'm not trained to speak with a six-year-old like that." Sergeant May then collected the rape kit from Dr. Davis and transported it to the property division at the Chattanooga Police Department. She also arranged for the victim to be

interviewed by a forensic interviewer the following day, October 11, 2012. Sergeant May observed the interview from a different room.

Sergeant May testified that a search warrant was served at Defendant's residence on October 15, 2012. She noted that a movie ticket stub to Hotel Transylvania was collected from a bedside table in Defendant's bedroom. Officers also collected the sheets, comforter, and towels from the room.

Defendant was taken into custody and transported to the police department. Sergeant May testified that she interviewed Defendant, and a translator was present for the interview. Defendant was advised of his rights, which he waived. The interview was recorded by both audio and video. Defendant told Sergeant May that he kissed the victim on the cheek. Sergeant May testified that Defendant's timeline of events was consistent with that of the victim.

Special Agent/Forensic Scientist Kim Lowe of the Tennessee Bureau of Investigation (TBI) crime laboratory, forensic biology unit, testified that she tested the DNA evidence in this case. Special Agent Lowe compared Defendant's DNA profile to swabs taken from the victim's cheek, outer vaginal area, and ear. She explained that DNA consistent in five locations with Defendant's was found on the cheek swab. She also testified that a full DNA profile that matched Defendant's DNA in fifteen locations was found on the victim's ear swab and vaginal swab. Special Agent Lowe acknowledged that the DNA from the victim's cheek swab could have been transfer DNA but the DNA from the ear and vaginal swabs in her opinion was by direct contact. The following exchange took place during cross-examination:

| [Defense Counsel]: | Okay. Now, c, the ear, had how many locations? |
| [Special Agent Lowe]: | It was a full profile, so we have 15 locations. |
| [Defense Counsel]: | Fifteen locations. And so, in your opinion, that is too many locations to be [sic] come from a transfer? |
| [Special Agent Lowe]: | Yes, especially since it was above our stochastic threshold. |
| [Defense Counsel]: | Okay. All right. So are you - - I just want to make sure I'm understanding - - your [sic] telling the jury that you cannot have direct transfer of DNA and will see 15 locations; is that what you're telling the jury? |
| [Special Agent Lowe]: | Yes. |
| [Defense Counsel]: | It's not possible? I want to make sure. |
| [Special Agent Lowe]: | It depends on how sensitive the kit is. Our chemistries and so forth, like the new stuff nowadays, it is possible, but the kits we used back then, they weren't as sensitive, so it's a lot harder then to get the full profile up. |

| | |
|---|---|
| [Defense Counsel]: | I understand it may be harder, but it - - a 15-location direct transfer happens, it's just whether your lab can pick it up with its particular test; correct? |
| [Special Agent Lowe]: | Not necessarily. |
| [Defense Counsel]: | Okay. |
| [Special Agent Lowe]: | Unless he's, like, rubbing really hard on that. |
| [Defense Counsel]: | Okay. |
| [Special Agent Lowe]: | But I highly doubt it would come from a transfer. |
| [Defense Counsel]: | Okay. |
| [Special Agent Lowe]: | My opinion is it's more direct contact. |
| [Defense Counsel]: | Okay. Your test now could pick up a direct transfer of that much, but the test you had then could not; is that what you're saying? |
| [Special Agent Lowe]: | It still wouldn't pick it up as strong as it did. It was a very strong profile that came up. |
| [Defense Counsel]: | Okay. And just so we'll know, what test are you talking about that you used in 2013 for this report for you to be able to say c had 15 locations and it could not be direct transfer? |
| [Special Agent Lowe]: | It was the Identifiler Plus Amplification kit. |
| [Defense Counsel]: | The IDIS? |
| [Special Agent Lowe]: | The ID Plus. |
| [Defense Counsel]: | ID Plus test? |
| [Special Agent Lowe]: | Yes. |
| [Defense Counsel]: | Okay. All right. Now, let's take a look at d, that's the outer vaginal, and it starts off - - we'll go to the top of the next page, but the only - - one sentence of that is on this page, and that's "Examination revealed the presence of alpha-amylase, which may indicate the presence of saliva," and that's the way each of the previous two had started, and we've already discussed that; correct? |
| [Special Agent Lowe]: | That is correct. |
| [Defense Counsel]: | Okay. All right. There's the paragraph about DNA, but the next one down, "The DNA profile obtained is a mixture of genetic material from at least two individuals." And again, we've talked about that. You can identify two. There may be fragments of others, but you've identified two; is that - - |
| [Special Agent Lowe]: | If there were fragments of others, I would have been able to tell you that, but in this case there is not. |
| [Defense Counsel]: | So what does - - then "at least two" just means two? |
| [Special Agent Lowe]: | On this instance, there are two individuals. |

| | |
|---|---|
| [Defense Counsel]: | Okay. So how many locations did you find on this particular test? |
| [Special Agent Lowe]: | It was a full profile, so 15. |
| [Defense Counsel]: | Okay. And again, we've had testimony that this young lady may have been kissed on her cheek by [Defendant], and if that's true, you are saying that a small child who touches that, and then we have testimony that within an hour or so - - well, some testimony about possible urination within 10 or 20 minutes of being in contact with [Defendant], and there was testimony a couple of hours later, there was a urine sample taken from the young child, and it's your testimony that that DNA in that outer vaginal area could not have come - - could not have come from direct transfer? |
| [Special Agent Lowe]: | On the amylase on this one, it was the strongest that showed positive for amylase, and it was also the strongest one that had the strongest profile. |
| [Defense Counsel]: | So? |
| [Special Agent Lowe]: | So no, it would probably be direct. |
| [Defense Counsel]: | Probably? |
| THE COURT: | Now, what was your answer? |
| [Special Agent Lowe]: | It would be direct contact. |
| [Defense Counsel]: | I think you said "probably"? |
| [Special Agent Lowe]: | Probably direct contact. |
| [Defense Counsel]: | Okay. "Probably" meaning? |
| [Special Agent Lowe]: | Most likely. |
| [Defense Counsel]: | More likely than not? |
| [Special Agent Lowe]: | Yes. |
| [Defense Counsel]: | And so that would be your answer for b as well, more likely than not, or the one we just did before this one, which was - - I'm sorry, I've got them - - is c, would that be your answer as well, "more probable than not," or stronger on the previous one than on this one? |
| [Special Agent Lowe]: | They are both strong on the amylase, they both have very strong profiles above stochastic threshold. They both are "most likely than not" come from direct contact. |
| [Defense Counsel]: | More likely than not? |
| [Special Agent Lowe]: | Yes. |
| [Defense Counsel]: | Okay. Your Honor, just a moment. |
| [Defense Counsel]: | Mrs. Lowe, I want to make sure, because I'm writing this down, "more likely than not"? |

| | |
|---|---|
| [Special Agent Lowe]: | More likely to come from direct contact than not. |
| [Defense Counsel]: | Okay. |
| [Special Agent Lowe]: | In that order. |
| [Defense Counsel]: | More likely than not to not come from direct contact? |
| [Special Agent Lowe]: | No. More likely to come from direct contact than transfer. |
| [Defense Counsel]: | Okay. All right. All right. That's - - more like than not to come from direct contact. Okay. And your basis for saying that to the jury is based on what treatise, treatise or literature that you are offering that opinion to the jury? |
| [Special Agent Lowe]: | Based on the number of tests I performed and all the cases that I've done, and the profiles, the strength of the profiles that I got, that is what I'm basing it on. In my opinion, based on the cases I have worked. Not on literature. |
| [Defense Counsel]: | Okay. So its - - I want to make sure I'm crystal clear. It's based on your experience and not on any research, literature, or treatise that are out there that may say otherwise? |
| [Special Agent Lowe]: | That is correct. |
| [Defense Counsel]: | Okay. And you're not relying on any of those things to bolster your view; your view is based on your experience? |
| [Special Agent Lowe]: | It's based on my experience and through my training. |

*Defense Proof*

Renato Tovar Gutierrez testified that most of his friends call him "Tito." On October 10, 2012, he was living with Defendant on North Concord Road. Mr. Gutierrez testified that he also lived at the residence when the victim, her father, and C.E. lived there. He did not recall if he saw the victim in the residence on October 10, 2012. Mr. Gutierrez did not believe that the victim saw him in his room that night because he always kept the door closed. He was usually able to hear when Defendant arrived home. Mr. Gutierrez was at the residence when police executed the search warrant on October 15, 2012. He did not recall anything usual happening four or five days before the warrant was executed.

Mr. Gutierrez recalled hearing Defendant come home on October 10, 2012, and that he was "walking and talking" on the phone. He said that Defendant left in less than three minutes after coming home.

Dr. Nancy Aldridge is a psychotherapist, forensic interviewer, and forensic evaluator. She is an expert in "forensic interviewing, child psychology." Dr. Aldridge reviewed the transcript of the forensic interview of the victim, and she reviewed the victim's trial testimony. Concerning the forensic interview, Dr. Aldridge testified:

> In reviewing the transcript of the interview, the interviewer followed protocol in that she developed rapport and gave the child guidelines as to how to respond. She talked about truth and only telling the truth, that she and the child both could only tell the truth. And then there were, after that, some statements that the child made that were misstated back to the child by the interviewer. There were some leading questions in the interview.
>
> *    *    *
>
> [. . .]. You look at consistency, what the child allegedly said prior to the forensic interview and then what the child said during the forensic interview. You also, talking about the pitfalls, knowing that this child had been previously interviewed, you absolutely do not want to suggest anything to the child, lead the child in any way, misstate what the child says to you, because her little memory's already impacted.
>
> The forensic interviewer needs to go back and ask more about the initial disclosure, which didn't occur in this case to the extent that it should have occurred, and the interviewer didn't explore what other exposure the child could have had that could have related to what the child was disclosing.

When asked if the forensic interview added to the problem or clarified the situation, Dr. Aldridge testified:

> Yes, sir. The forensic interviewers definitely asked questions incorrectly. They did not allow the child to disclose from her free narrative, ask open-ended questions. When the child answered, the proper thing to say is "Tell me more, tell me what happened next, what happened before, tell me everything you can about a situation." There were more direct questions, yes-no types of questions, and as I said, there were some mis-, misleading questions in there. So it would add to the, the contamination because some of what this child said in the interview, even in the interview, didn't come from the child; it came from the interviewer.

Dr. William Joseph Watson, an expert in DNA analysis, is currently the CODIS administrator for the State of New Mexico. He explained that CODIS is the combined DNA indexing system. He further testified: "It's the local, State and national DNA database used by law enforcement to match convicted offenders to evidence that's found at crime scenes." Dr. Watson reviewed the documentation of the DNA analysis performed by the TBI in the present case. He agreed that the DNA from the swab of the victim's cheek could have been from direct contact or a transfer. Dr. Watson noted that Defendant could have actually touched or kissed the victim's face, which would be direct contact, or "she could have touched his hand or touched his face and touched her own," which would be transfer. He agreed that he could not tell with any certainty how DNA consistent with Defendant's DNA got on the victim's cheek. Dr. Watson noted that "[y]ou can get transfer DNA without ever coming into contact with someone. You just have to be in the same location."

Dr. Watson agreed that the DNA swab from the victim's ear showed a DNA profile with a "mixture of genetic materials from at least three individuals." The major contributor of DNA in the sample was from the victim, and Defendant was the minor contributor. There was "no further information concerning additional minor contributions due to insufficient and/or degraded DNA." Dr. Watson did not agree with Special Agent Lowe's opinion that DNA from the victim's ear more than likely got there by direct touch. He testified:

> Well, my opinion is, is that a statement like that has no real basis in science. It is possible to come into contact with a surface that has a lot of DNA on it or a little DNA on it. If you get a surface with a lot of DNA and you touch something on your body, you can transfer a lot of DNA. If you come into contact with a surface with a small amount of DNA and you touch your body, it will be a small amount of DNA. So the fact that it's a full profile or not a full profile may be related to direct transfer or direct contact, but it may not be, and the problem is, there is no way to say for sure.

> I'll give you an example. If, for example, [Defendant] came into – kissed the victim on the cheek and the victim touched her cheek and it was damp with saliva, and touched her ear, there could be a lot of DNA transfer.

> If there was saliva on a surface or if there was a significant amount of his DNA on a surface and she touched it and touched her ear, there could be a lot of DNA. Maybe then she touched her cheek and there would be less, and maybe then she touched her hand and there would be even less. So the problem is, is we can't really say what order any of that occurred in, or if that occurred, or which one had which - - which stain, just by

looking at it, has more DNA. That's the reason why we can testify to the DNA. We can say that in the 1-b swab from the cheek, five loci are consistent with [Defendant]. That's borne out by the data. It absolutely is.

In 1-c, there are 15 loci that are consistent with [Defendant]. That's borne out by the data. There's no argument. How it got there, that's what's at issue and that's something that the science can't tell you definitively one way or the other.

Dr. Watson testified that the presence "alpha-amylase" could come from saliva or urine. He agreed that the portion of Special Agent Lowe's report concerning the swab of the victim's outer vaginal and buttocks area which stated that "examination revealed the presence of alpha-amylase, which may indicate the presence of a saliva" was a true statement. However, he noted that the "alpha-amylase" could have come from urine. Dr. Watson did not agree with the conclusion that the DNA from the swab of the victim's outer vaginal and buttocks area was by direct contact. He testified:

No, it's the same problem. I mean, if the victim transferred a large amount of his DNA - - and when I say "a large amount," I mean, we're not talking about much DNA. It only takes about, well, for a full profile, mixed sample, depends on the lab, but maybe as little as 150 picograms, maybe a bit more.

\*        \*        \*

So you've got about six picograms of DNA in a cell, in an intact cell, so what is that? About, let's see, 150 to 200 divided by six - - math was never my strong suit - - let's say 30 to 40 cells worth of DNA.
Now again, is that - - there could certainly be a lot more than that, there probably is not much less than that in the sample that was tested, so, so again, we're talking about enough DNA to get a full profile, which, like I said, is about 150 picograms or more, depending on the lab. But it doesn't mean that there's, like, a large deposit of DNA that would be in something that would necessarily even be a visible stain, so, so you can't say how this got there.

You can certainly say the possible explanations for it, and that is certainly one possible explanation is what [Defendant] is being accused of is accurate, that could be a possibility; but it's also possible that that's not accurate, that this could be transfer, because we don't know. I think if the testimony was that the cheek swab partial profile might have been

consistent with transfer, well, that means transfer could have happened in this case. There's just no way to say.

We can say that it matches his DNA, it's a full profile, 15 loci, we can't exclude him, and, and we have a presumptive positive test for amylase, which may or may not indicate the presence of saliva. That's all we can say for sure.

On cross-examination, Dr. Watson agreed that alpha-amylase is found in urine, fecal matter, and perspiration. He noted that "generally speaking, it is found at a higher level in saliva than in other bodily fluids[.]" Dr. Watson agreed that the DNA found on the victim's outer vaginal swab was the strongest sample of DNA. He further testified:

If we're thinking about potentially transfer, that certainly could, if it was transferred from the victim's hand to her body, that might have been the first site of transfer, and then from there, touch somewhere else on her ear and then her face or whatever, resulting - - each transfer, generally speaking, you go from a higher amount to a lower amount, so - - so what I'm saying is, it could be transfer, it might not be. If it was transfer, it could be the first site of transfer, but it did not have more DNA than the other samples, yes.

*State's Rebuttal Proof*

Brenda Reed is employed by the Children's Advocacy Center in Hamilton County as a forensic interviewer coordinator. She interviewed the victim on October 11, 2012. A DVD of the interview was played for the jury. Ms. Reed testified that Officer Luis Diaz was also in the room because he was acting as a Spanish interpreter. She noted that no one else is usually in a room with the victim when she conducts an interview. Ms. Reed testified that Officer Diaz asked some of his own questions during the interview which he was not supposed to do. However, she did not feel that the questions compromised the integrity of the interview.

On cross-examination, Ms. Reed disagreed with Dr. Nancy Aldridge's testimony that her interview with the victim did not follow protocol. She also was unaware of any violation of protocol by having a uniformed police officer serve as an interpreter during the interview. Ms. Reed testified that when Officer Diaz began asking questions, she "attempted to handle things the best [she] could." Ms. Reed further testified that she did not know anything about the victim's mother before the interview or their living arrangements. She said, "That's the information I would obtain from the child as I want them to tell me[.]" She also noted that she obtains very little information before an interview because that can affect her questioning. Ms. Reed testified that she did not have a reason to ask the victim about her possible sources of sexual knowledge. She said,

- 11 -

"I go based off of what the child told me when she told me she has been licked, and that's obvious knowledge that she has herself." Ms. Reed testified that she had no reason to believe that the victim was lying during the interview. She did not believe that asking the victim "[h]as something happened" was a leading question or that it violated protocol. Ms. Reed said, "That is the protocol I'm supposed to be following." Ms. Reed did not feel that other questions that she asked the victim were leading, and her questions were proper.

Ms. Reed agreed that it was not proper protocol for Officer Diaz to ask the victim if Defendant kissed her just after the victim had said, "[Defendant] kissed the girls on the mouth." However Ms. Reed testified that Officer Diaz "did obtain the information that we needed[.]" She agreed that Officer Diaz also asked the victim additional questions. Ms. Reed did not agree that Officer Diaz's questions were "out of control." She thought that he was attempting to make the victim comfortable. Ms. Reed testified that the victim "gave an accurate description of what happened."

On redirect examination, Ms. Reed agreed that it was not her job to prosecute Defendant, and she did not have any "stake" in whether he was prosecuted or not. She said, "My goal is to get the most accurate information possible from a child." Ms. Reed further agreed that she begins an interview with very little information in order to avoid bias. When asked why she told the victim that she was not in trouble, Ms. Reed testified:

> That's something that we use as part of our guidelines to - - with all children. Typically when they've been called into an office with an adult/grownup that they don't really know, they think that something's wrong, something's in trouble, they're in trouble for something, so that's why we just reassure them "you're not in trouble for anything."
>
> And with older kids who very well may be in trouble outside the interview room in terms of juvenile issues, other things like that going on, we even tell them "you're not in trouble with us today," so that they know whatever - - they can talk about, say whatever they need to in that room, they're not going to get in trouble, especially if they have to use words that are not typically words they can use at home. They can use those words in our room and they're not going to get in trouble either.

Ms. Reed also noted that all of her interviews do not "flow" exactly the same. She said, "They're all child-specific, they all follow the child's lead where they take us, we obtain the information as they're giving us that information, and they all disclose differently and are in different parts of disclosure at different times."

*Analysis*

## I. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain his conviction for rape of a child and that the trial court erred by not granting his motion for a directed verdict. He contends that "the State did not prove beyond a reasonable doubt that any sexual contact or crime whatsoever took place" and that "the State did not prove beyond a reasonable doubt that Appellant sexually penetrated the victim's vaginal (genital) opening via any intrusion whatsoever, however slight." Defendant further argues that "[b]elieving every word of the fact witnesses, [C.E.] and [the victim], means abandoning reality." He also asserts that "no timeline proffered by the State even makes their story plausible." We disagree.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins,* 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews,* 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

As for Defendant's motion for a directed verdict, we assume that trial counsel intended to move for a judgment of acquittal rather than a motion for directed verdict. A motion for a judgment of acquittal is a challenge to the sufficiency of the State's evidence of a defendant's guilt. *See* Tenn. R. Crim. P. 29(a)("Directed Verdict Abolished. Motions for directed verdict are abolished and are replaced by motions for judgment of acquittal."). "The duty of the trial judge and the reviewing court on the determination of a motion for a judgment of acquittal is the same as on a motion for a directed verdict." *State v. Thomas*, 158 S.W.3d 361, 386-87 (Tenn. 2005). Similarly, the standard of review for a trial court's denial of a motion for a judgment of acquittal is the same as the "standard that applies on appeal in determining the sufficiency of the evidence[.]" *State v. Little*, 402 S.W.3d 202, 211 (Tenn. 2013).

Tennessee Code Annotated section 39-13-522(a) defines rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Sexual penetration includes "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

Viewing the evidence in the light most favorable to the State, and contrary to Defendant's assertions, there was ample proof that Defendant committed the offense of rape of a child. The victim's mother testified that the victim told her that Defendant kissed her mouth, neck, and her vagina. Dr. Tamara Davis examined the victim at T.C. Thompson Children's Hospital. She spoke with C.E. who told her that the victim disclosed to her "a family friend had kissed her mouth and face and licked and touched her vaginal area and buttocks without penetration." Dr. Davis then performed a "head-to-toe" examination of the victim and collected a rape kit. She used a black light for a portion of the exam and then swabbed those areas for DNA evidence. Dr. Davis noted that the areas around the victim's mouth and outer vaginal lips/buttocks "fluoresced" from the black light. She testified that "with those areas immunoflourescing or lighting up with the black light, they could potentially be sites for bodily fluid we could swab to get DNA evidence." Special Agent Kim Lowe of the TBI tested the DNA in this case and determined that a full DNA profile that matched Defendant's DNA in fifteen locations was found on the swab from the victim's vaginal area. It was her opinion that the DNA was from direct contact. She also noted that the vaginal swab had the strongest DNA profile.

The now ten-year-old victim testified that Defendant sat her on his bed, pulled her pants and underwear down and began licking "[i]n her private" and on her neck, and he kissed her on the mouth. The victim told Defendant to stop but he did not stop. Defendant later took the victim home, and she told her mother what happened. During the forensic interview at the child advocacy center, the victim, who was six years old at the time, was asked to indicate on a drawing where on her body Defendant had licked her. She drew a circle around her vagina. Also during the interview, the victim indicated that Defendant kissed her "pee pee" with her tongue. This obviously does not refer to the victim's buttock area as alleged by Defendant in his brief. Ms. Reed testified that she had no reason to believe that the victim was lying during her interview at the child advocacy center.

"While touching alone without intrusion would not constitute penetration under our statute, licking does. Penetration includes cunnilingus which has been defined by our courts as 'oral contact with the female genitals.' Oral penetration into the vagina is not required." *State v. Reginald L. Parker*, No. 02C01-9306-CR-00130, 1994 WL 716272, at

- 14 -

*2 (Tenn. Crim. App. Dec. 28, 1994); *State v. Troy Love*, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *15 (Tenn. Crim. App. Mar. 21, 2017). The victim testified that the Defendant licked her private part. A jury could easily infer that the victim was referring to her vagina. The jury, as was its prerogative, accredited the testimony of the State's witnesses and resolved any inconsistencies in favor of the State. Viewed in the light most favorable to the State, a rational trier of fact could find the Defendant guilty of rape of a child. *State v. Farr*, No. M201601216CCAR3CD, 2017 WL 4280701, at *7 (Tenn. Crim. App. Sept. 26, 2017), *appeal denied* (Jan. 17, 2018).

## II.      Prosecutorial Misconduct

Defendant argues that the State made improper arguments during closing statements by mischaracterizing the evidence presented at trial. More specifically, Defendant contends that the State improperly argued that Defendant licked the victim's vagina, that Defendant's saliva was on the victim's vagina, and that cunnilingus was performed on or in the victim's vagina. We agree with the State that the Defendant failed to contemporaneously object to the comments made by the prosecutor during closing argument, and typically, when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 & 36(a); *see also State v. Thornton*, 10 S.W.3d 229, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). Accordingly, this issue is waived, and we also decline plain error review.

## III.     Excited Utterance

Defendant argues the victim's statement to her mother and her mother's subsequent phone call to 911 were inadmissible as they do not fall under any exceptions to the hearsay rule. Hearsay is "a statement other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay is not admissible unless an exception applies. Tenn. R. Evid. 802. An excited utterance, or "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition," is an admissible exception under the rule. Tenn. R. Evid. 803(2).

In order to determine the admissibility of an alleged excited utterance, courts are to apply a three-part test. First, the court must determine if a startling event or condition occurred. The event "must be 'sufficiently startling to suspend the normal, reflective thought process of the declarant.'" *Kendrick v. State*, 454 S.W.3d 450, 478 (Tenn. 2015), *cert. denied*, 136 S. Ct. 335 (Oct. 13, 2015) (quoting *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)). Next, the court must determine whether the alleged statement relates to the startling event. "A statement relates to the startling event when it describes all or

part of the event or condition, or deals with the effect or impact of that event or condition." *Id.* (citing *State v. Stout*, 46 S.W.3d 689, 699 (Tenn. 2001)). Finally, the court must find that the statement was made while the declarant was under stress or excitement from the startling event. *Id.* Courts should consider "whether the statement suggests 'spontaneity' and whether the statement has a 'logical relation' to the shocking event." *Id.* (quoting *Gordon*, 952 S.W.2d at 820); *see also State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993); *Garrison v. State*, 40 S.W.2d 1009, 1011 (1931). When a statement meets each prong of the test, it passes muster under the excited utterance exception to the hearsay rule. *Id.*

The three-part test guides this Court's review of the victim's statements and the 911 call. Additionally, the Tennessee Supreme Court announced the following standard regarding our review of hearsay evidence on appeal:

> The standard of review for rulings on hearsay evidence has multiple layers. Initially, the trial court must determine whether the statement is hearsay. If the statement is hearsay, the trial court must then determine whether the hearsay statement fits within one of the exceptions. To answer these questions, the trial court may need to receive evidence and hear testimony. When the trial court makes factual findings and credibility determinations in the course of ruling on an evidentiary motion, these factual and credibility findings are binding on a reviewing court unless the evidence in the record preponderates against them. Once the trial court has made its factual findings, the next questions— whether the facts prove that the statement (1) was hearsay and (2) fits under one of the exceptions to the hearsay rule—are questions of law subject to de novo review.

*Id.* at 479.

The facts in the record support the trial court's admittance of the victim's statement and the 911 call made by her mother under the excited utterance exception to the hearsay rule. Tenn. R. Evid. 803(2). Concerning this issue, the trial court made the following findings:

> 803(2) states that an excited utterance is not excluded by the hearsay rule. In order to be an excited utterance, a statement must relate to a startling event or condition and be made while the declarant was under the stress of excitement caused by the event or condition. The child's statement to the mother relayed to the 911 operator would be hearsay except for the fact that it could be an excited utterance and not excluded by the hearsay rule.

The first question, is the statement of the child relating to a startling event or condition? The child is telling her mother that - - the six-year-old child is telling her mother that the defendant kissed her, touched her private parts, and, according to the mother's testimony, said that the defendant licked her vagina. The Court finds that because the mother testified that the child, when she was asked about why she smelled of saliva, that the child got nervous, that the child got unsettled and started to cry, the Court finds that that reflects the child's emotion and that the event was an event that, like we would have anticipated, would have been a startling event or condition to the child.

The Court would expect that this kind of physical activity, if it did occur by an adult on a six-year-old child, would be startling. And the child's emotion, as testified to by the mother, the Court finds to be credible related to that particular issue, and the Court makes that finding based on observing her on direct testimony and on cross-examination.

The Court finds that this certainly would be a startling event or condition; and the Court finds that the declarant, the child, was under the stress of the excitement, as exhibited by her emotion, the nervousness, the unsettled nature of her emotion and her crying; and the Court finds that the time of the startling event was on the night on which the statement was made by the child to her mother, and, as [the prosecutor] argued, that the child's mother was the first adult to receive the report from the child of this startling event involving the touching and licking of her vagina.

So the Court finds that the statement by the child for those reasons is an excited utterance.

And then related to the phone call and the mother's statements in the phone call, the question, again, related to the timing of the phone call, certainly the mother almost immediately called 911. Her testimony was that the first thing that came to her mind was to call the police at 911. So certainly the timing of the statement in relation to the startling event that the mother witnessed is satisfactory and meets the standard for what is deemed to be an excited utterance.

The Court must find that the event that the mother witnessed was startling, and the Court finds that the six-year-old child telling her mother that this friend of their family had not only kissed her six-year-old daughter, but had touched and - - touched her private parts and licked her vagina, that that indeed was a startling event for the mother, and that

- 17 -

the mother made the statement while under the stress of excitement and that she immediately called 911.

> Different people do express emotions in different ways. The Court gives credit to the testimony of the mother here that her statement was, "I was in shock." I think that it's possible to make a statement while in shock and not appear to be - - well, rather than stating it in a negative context, I'll say this: I think it's possible to make a statement while in shock and have a flat emotion displayed rather than the heightened emotion, but I still believe the mother was in shock based on just the nature of what I would have expected her to be based on this kind of a report and the fact that the mother immediately called 911. She didn't call a friend, she didn't call another family member; she called the police immediately and made this report.

> So I find that both statements by the child and by the mother, the mother's statement being on the 911 recording, that both of those statements were excited utterances and are admissible.

The record supports the trial court's findings. C.E. testified that shortly after the victim arrived home from being with Defendant, she kissed the victim on the cheek and noticed that it smelled like saliva. She then asked the victim if someone had kissed her on the mouth or the cheek. C.E. noticed that the victim became nervous, and the victim told her that Defendant had kissed her. When C.E. asked if anything else happened, the victim began to cry and said that Defendant kissed her mouth, her neck, and her vagina. C.E. immediately called 911. She testified: "Well, I was in shock. The first thing that came to mind was to call the police at 911." C.E. further said: "I thought the worse. I thought that he had abused her, raped her; and while I was on the phone, I took her pants off to make sure nothing was wrong." The evidence presented at trial established all three prerequisites necessary for the statement by the victim and the 911 call to be admitted as excited utterances. Defendant is not entitled to relief on this issue.

## IV. Length of Sentence

Defendant contends that the trial court erred by imposing a sentence of thirty years for his rape of a child conviction.

Our standard of review of the trial court's sentencing determinations is whether the trial court abused its discretion, and we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. T.C.A. § 40-35-401 (2017), Sentencing Comm'n Cmts. In

determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant made in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* T.C.A. § 40-35-210; *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2017).

Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d at 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10.

Here, the record reflects that the trial court in sentencing Defendant that two enhancement factors were considered, including Defendant's history of criminal convictions in addition to those necessary to establish the range, and Defendant abused a position of private trust in the commission of the offense. *See* T.C.A. § 40-35-114(1) & (14). The trial court also found as a mitigating factor that Defendant had a consistent work history. T.C.A.§ 40-35-113(13). The record supports consideration of the two enhancement factors in determining the sentence. Defendant does not challenge the trial court's consideration of those factors in setting the sentence.

Defendant's conviction for rape of a child is a Class A felony. As a Range II offender, Defendant's sentencing range was twenty-five to forty years by operation of law for the offense of rape of a child. T.C.A. §§ 39-13-522(b)(1), 30-13-522(b)(2), and 40-35-112(b)(1). Defendant's sentence of thirty years for this offense is within the range.

We conclude that the trial court properly sentenced Defendant. The trial court considered the relevant principles and sentenced Defendant to a within-range sentence. As such, the Defendant is not entitled to relief on this issue.

_____
THOMAS T. WOODALL, JUDGE